CONWAY CORPORATION, et al. *v.* CONSTRUCTION ENGINEERS, INC.

89-34                                    782 S.W.2d 36

Supreme Court of Arkansas
Substituted Opinion on Denial of Rehearing
December 11, 1989.*

---

*REPORTER'S NOTE: Original opinion was delivered October 30, 1989.

*Friday, Eldredge & Clark*, by: *Michael G. Thompson* and *Guy Alton Wade*, for appellants The Conway Corporation, M.D. Limbaugh Construction Co., Jim Brewer, John Doe I, John Doe II, and defendants Larry Graddy, Frank Robbins III, Lou Gardy, Bill Pate, Bob Clifton, and Leo Crafton III, as Members of the Board of Directors of the Conway Corporation.

*Wright, Lindsey & Jennings*, for appellant Bennie J. McCoy.

*Zachary D. Wilson*, for amicus curiae Arkansas Water Managers Association.

*David A. Orsini*, for appellee Construction Engineers, Inc.

*Jim Rhodes*, for appellee Michael Sutterfield and Catherine N. Rushing.

*Wallace, Dover & Dixon*, by: *Janice W. Vaughn*, for intervenor Associated General Contractors of America, Arkansas Chapter.

DARRELL HICKMAN, Justice. Construction Engineers, Inc., (CEI), the low bidder on a municipal construction contract, sued the appellants for wrongfully rejecting its bid and awarding the contract to the second lowest bidder, Limbaugh Construction Company. Appellants are the Conway Corporation, a nonprofit

corporation which, under contract, operates the utilities owned by the City of Conway; the Corporation's directors; Jim Brewer, the general manager of the Corporation; and Bennie McCoy, the engineer on the construction project. The chancellor found the appellants wrongfully rejected CEI's bid. Because that finding was clearly erroneous, we reverse and dismiss this case.

CEI filed suit in Pulaski County Chancery Court on August 20, 1986, seeking injunctive and declaratory relief and damages.[1] The complaint alleged the contract was awarded in violation of the law, and that the appellants had conspired to interfere with CEI's business expectancy. The appellants answered that they were immune from tort liability, and that they had exercised good faith discretion in carrying out their public duties.

After the lawsuit was filed, and without objection by the appellants, CEI requested a special master to hear evidence on the issue of temporary injunctive relief. In determining whether CEI had a probability of success on the merits, the master found there was a reasonable basis for the rejection of CEI's bid and that the appellants had acted in good faith.

Those findings were presented to the chancellor. He did not immediately accept or reject the findings, but held a hearing to receive additional evidence. He concluded that an injunction should not issue because construction on the project was already 43% complete, but he rejected the remainder of the master's findings. He determined that the Corporation's rejection of CEI's bid was arbitrary and without cause and that Brewer and McCoy acted in bad faith in urging rejection of the bid. The appellants were held jointly and severally liable for $194,295, the profit CEI would have made had it received the contract. Ratepayers, who had intervened with an illegal exaction suit, were awarded the $66,100 difference in CEI's and Limbaugh's bids.

The appellants seek reversal on a myriad of issues, including immunity, lack of jurisdiction, due process, improper remarks by the chancellor, and insufficiency of the evidence. CEI cross-appeals, asking for attorney fees, prejudgment interest and

---

[1] The suit was filed in Pulaski County because McCoy, the engineer, is a resident there.

punitive damages. *Amicus curiae* briefs have been filed by the Arkansas Water Managers Association and by the Associated General Contractors of America. The case is resolved most readily by examining the evidence and the chancellor's findings.

In May of 1986, the Conway Corporation solicited bids on the expansion of Conway's water treatment plant. Jim Brewer asked Bennie McCoy to contact CEI and dissuade it from bidding on the project. The basis for Brewer's concern was CEI's performance in 1980-1981 as general contractor on another local project, the construction of an elementary school for the Conway School District. According to Brewer's information (which was received from his close friend and school superintendent Carl Stuart, as well as from local newspaper articles), there had been serious problems with the school's plumbing, cabinetwork, and windows as a result of faulty construction. When a dispute arose among CEI, the architect, the school district and the subcontractors as to who was responsible for the problems, a lawsuit was brought, resulting in lengthy delays. The school's problems were apparently well known throughout Conway and Brewer described the project as a "fiasco."

Following Brewer's instructions, McCoy called Steve and Danielle Smith, the husband and wife engineers who owned CEI, on May 19 and May 29 and wrote them on June 3 to express Brewer's reservations about their ability to perform the work. He told Steve Smith, "I understand you got a bit of a black eye in the Conway community over the Conway school you built." Smith admitted he had gotten "cross-ways" with the architect on that project. McCoy also asked about rumors that CEI was behind schedule on one of its current projects, the construction of a sewage plant in nearby Morrilton. Smith said he was behind because of late equipment deliveries but expected that his completion schedule would be extended. CEI was not dissuaded from submitting a bid.

Bids were opened on June 26. CEI's bid was lowest and Limbaugh's the next lowest. Brewer immediately ordered McCoy to conduct a post-bid investigation of both CEI and Limbaugh (neither Brewer nor McCoy was familiar with Limbaugh). In the meantime, Brewer obtained legal advice on the propriety of awarding the contract to the second lowest

bidder.

Between June 30 and July 3, McCoy spoke with various references who gave excellent reports on Limbaugh, but gave CEI, at best, mixed reviews. One reference reported that CEI did good, quality work, and CEI's surety gave a favorable report. But damaging references were given by the engineers on the Morrilton project who spoke of supervisory problems and a "paper war" which resulted when CEI missed a critical milestone, and by the architect on the Conway school who said the project was the worst he had ever experienced.

These matters were presented to the board of the Corporation at its next meeting. The board was concerned that the improvements be completed on time to avoid an anticipated water shortage. After hearing Brewer's information and recommendation, the members were unanimous in their conviction that the job could be completed on time with Limbaugh, but not with CEI. They also noted that, while CEI had never completed a project of this magnitude, Limbaugh had constructed ten water and sewage treatment plants in the past five years.

The first question we must answer is, did the Corporation have the discretion to award the contract to anyone other than the lowest monetary bidder? The answer is yes.

CEI and the Associated General Contractors rely on Ark. Code Ann. §§ 19-11-403 and 404 (1987), arguing that the Corporation had no discretion to award the contract to anyone other than the lowest bonded bidder. Section 19-11-403 provides that bids submitted on public construction contracts must be accompanied by a surety bond. Section 19-11-404 provides as follows:

> All bidders being made responsible in the manner stated in § 19-11-403, it shall be the duty of persons empowered to accept bids to accept no other bid than the lowest, except upon default of the lowest bidder.

The appellants urge the application of Ark. Code Ann. § 22-9-203 (1987), which governs the award procedure on public improvement contracts, including municipal improvements costing over $10,000. Section 22-9-203(d) provides that the awarding authority shall:

[O]pen and compare bids, and thereafter award the contract to the lowest responsible bidder, but only if it is the opinion of the authority that the best interests of the taxing unit would be served thereby.

■ We find the legislature did not intend §§ 19-11-403 and 404 to apply to contracts like the one here. Numerous public contracts are specifically exempted from the requirements of those statutes under Ark. Code Ann. § 19-11-402(b) (1987):

The provisions of this subchapter shall not be applicable to:

(1) Highway maintenance and construction contracts;

(2) Any contracts let by the Office of State Purchasing;

(3) Any contracts let by counties of this state;

(4) State agency contracts for commodities and services subject to other appropriate law;

(5) Cities and towns having boards of public affairs operating public utilities, auditoriums, airports, or other city owned properties; or

(6) Commissions appointed by cities operating public utilities, auditoriums, airports, or other city owned properties.

In light of these many exceptions, it is apparent the legislature intended this law to apply only to a limited class of public contracts. In fact, a recent amendment exempts any contract let by a municipality. See Ark. Code Ann. § 19-11-402(b)(3) (Supp. 1987).

The statute particularly exempts contracts let by municipal utility commissions. Although the Conway Corporation is not, strictly in name, a utility commission, that is what it is; it performs the same duties as a commission in managing and operating a municipal waterworks. See Ark. Code Ann. § 14-234-306 (1987).

■ Finally, § 22-9-203 applies to specific types of public contracts — major repairs or alterations, erection of buildings or other structures, or permanent improvements, costing over a

certain dollar amount. Since this specific statute governs the subject, its application is favored over the more general provisions of §§ 19-11-401 to 405. *Williams* v. *City of Pine Bluff*, 284 Ark. 551, 683 S.W.2d 923 (1985).

■ We find the Corporation, under § 22-9-203, had the discretion to reject CEI's bid so long as the rejection was for good cause and in good faith. *Worth James Constr. Co.* v. *Jacksonville Water Comm'n*, 267 Ark. 214, 590 S.W.2d 256 (1979).

So, the next question we must answer is whether the chancellor's finding of bad faith is clearly erroneous. We find it is.

■ Chancery cases are tried *de novo* on appeal, but we will not reverse the chancellor's findings unless clearly erroneous, giving due deference to the chancellor's superior position in determining the credibility of the witnesses. *Rose* v. *Dunn*, 284 Ark. 42, 679 S.W.2d 180 (1984); ARCP Rule 52(a). In applying that standard of review in this case, it is important to remember that the master, not the chancellor, heard the testimony of appellant McCoy[2] and that the chancellor should accept the master's findings unless clearly erroneous. ARCP Rule 53(e)(2). Three factors were crucial to the chancellor's decision: (1) he called McCoy's investigation cursory and biased, and said that negative information had been deliberately solicited; he specifically questioned McCoy's truthfulness, saying his July 3 notes on CEI referred to incidents that did not happen until the following August; (2) between the time of the school project and this project, CEI had done satisfactory work on another job for the Corporation; and (3) there was evidence that Brewer had decided, even before the bids were opened, not to award the contract to CEI.

■ Bad faith consists of dishonest, malicious or oppressive

_____

[2] There was some confusion over the subject matter of the hearing held by the chancellor. The appellants understandably thought it concerned injunctive relief only and McCoy was actually excused from the hearing. The only testimony he gave was at the hearing before the master. All appellants asked the chancellor for another opportunity to present evidence concerning their liability. The chancellor refused but allowed additional testimony to be proffered through affidavits. It is not clear whether we may consider those proffered affidavits in our *de novo* review, but we will not do so here. Our decision is based on the evidence considered by the master and the chancellor.

conduct with a state of mind characterized by hatred, ill will or a spirit of revenge. *Stevenson* v. *Union Standard Ins. Co.*, 294 Ark. 651, 746 S.W.2d 39 (1988). The chancellor's determination that McCoy's investigation was biased and dishonest is not supported by the evidence. McCoy received both positive and negative comments on CEI and duly reported both. Nothing indicates he manufactured the negative comments or reported them in a manner that obscured the truth.

The allegation that McCoy's notes referred to an event that had not yet taken place is also unfounded. The notes show he spoke with an engineer on the Morrilton project on July 3 and was told that there were problems with a small structure erected by CEI. The chancellor was convinced by CEI's argument that problems with the structure did not occur until August 1, but Billy Joe Roper, a foreman on the project unequivocally testified he spoke with the engineer about problems with the structure *30 to 45 days before* August 1. If the engineer did mention the structure to McCoy (a fact which the engineer could not recall, but did not flatly deny), it could have happened on or before July 3. It is also important that the notes containing the information were written by McCoy for his own personal use in preparing for a deposition in this case.

The chancellor also referred to the fact that CEI was allowed to bid on two Conway Corporation projects in 1984. One job involved the same water treatment plant, but did not require CEI to perform as a general contractor, only a subcontractor on a job costing less than $35,000. The other project was construction of an office building for the Corporation. CEI was an unsuccessful bidder on that project, and Brewer testified he was not aware CEI had submitted a bid. It is clear that neither of these projects involved CEI operating as a general contractor on a crucial municipal project on which time was of the essence.

Finally, the chancellor found that Brewer made his decision to reject CEI's bid before any investigation took place. There is a reasonable basis for that finding. The efforts to dissuade CEI from bidding took place a month and a half before bids were opened. Brewer even used Limbaugh's bid figure in his budget tabulation, compiled on the day of the bid opening. But there is no evidence that this action was taken with any motive other than the

desire to avoid the same delays and problems that plagued the last local municipal project on which CEI performed as a general contractor.

■ The record is simply void of any evidence that the Corporation, Brewer or McCoy acted with improper motives or with hatred, ill will or a spirit of revenge. Because the chancellor's findings were clearly erroneous, and because he gave no reason for rejecting the master's findings as clearly erroneous, we find the Corporation did not exercise its discretion in bad faith. Therefore, the award to the ratepayers and the award of lost profits against the Conway Corporation are reversed.

■ This does not resolve the issue of Brewer's and McCoy's liability because bad faith need not be proven to recover for tortious interference with a business expectancy. *Walt Bennett Ford Inc.* v. *Pulaski County Spl. School Dist.*, 274 Ark. 208, 624 S.W.2d 426 (1981), *supp. opinion on denial of rehearing.* However, the defendant may show his interference was privileged. Privilege means a defendant will not be liable if he acts, without bad faith, to protect the public interest or a third person to whom he stands in a relation of responsibility. The evidence, as stated above, shows Brewer and McCoy should have the benefit of the privilege. They acted without bad faith in the interest of those to whom they were responsible and should not be held liable for interference with a business expectancy.[3] Therefore, the award of damages against them is reversed.

We do not reach the issue of whether the appellants are immune from liability as municipal agents or employees. *See* Ark. Code Ann. § 21-9-301 (1987); *Matthews* v. *Martin*, 280 Ark. 345, 658 S.W.2d 374 (1983).[4] Nor do we reach the question of whether the claim against appellant McCoy should have been transferred to circuit court. *See McCoy* v. *Munson*, 294 Ark. 488, 744 S.W.2d 708 (1988). Having reversed the award of damages,

---

[3] We do not address the question of whether CEI had a valid business expectancy, nor do we decide whether Brewer and McCoy, as agents of the Corporation, interfered with CEI's contract with a "third party." *See Navorro-Monzo* v. *Hughes*, 297 Ark. 444, 763 S.W.2d 635 (1989).

[4] Ark. Code Ann. § 16-120-102 (Supp. 1987), which grants immunity to nonprofit corporations, was not in effect at the time this cause of action arose.

we do not address CEI's issues on cross-appeal.

One issue does merit discussion. This case was tried prior to our decision in *Klinger* v. *City of Fayetteville*, 297 Ark. 385, 762 S.W.2d 388 (1988). In *Klinger* an unsuccessful bidder sued the city for lost profits. We said the following:

> We find the general rule to be that statutes requiring competitive bidding for government contracts are enacted for the benefit of the taxpayers rather than for the benefit of those who would sell goods and services to governmental entities. Although violation of a competitive bidding statute may create a right to an equitable remedy or mandamus, it does not give rise to a claim for damages. (Cites omitted.)

The appellants claim this language requires reversal of the award of damages against them.

The appellee counters this argument by citing *Walt Bennett Ford Inc.* v. *Pulaski Spl. School Dist., supra.* There, a disappointed bidder sued to set aside a contract between the school district and the successful bidder and also sued various individuals for the tort of interference with a contract. We held that "an unsuccessful bidder does have standing to sue for alleged wrongs" in the bidding process.

Prior to the *Walt Bennett Ford* case, our law was that a disappointed bidder had no standing to sue for a violation of competitive bidding statutes. In *Bank of Eastern Ark.* v. *Bank of Forrest City*, 94 Ark. 311, 126 S.W. 837 (1910), and *Arkansas Democrat Co.* v. *Press Printing Co.*, 57 Ark. 322, 21 S.W. 586 (1893), we held that injunctive relief was not available to the unsuccessful bidder because he had no standing. Those cases were expressly overruled in *Walt Bennett Ford.* We held the appellant, who had not asked for an injunction or lost profit damages, had standing to seek voidance of the contract. We recognized the tort action against the individuals as being a separate and distinct cause of action in which standing was not an issue.

The two cases are not irreconcilable. An unsuccessful bidder may challenge the legality of the authority's action by way of injunctive or declaratory relief or mandamus for example, but

he may not recover lost profit damages from the authority. Even so, according to *Walt Bennett Ford*, he is not prevented from pursuing a tort action and damages against individual defendants, such as Brewer and McCoy in this case. But that statement is without regard to the question of immunity, which was not an issue in *Walt Bennett Ford*.

Reversed and dismissed.

PURTLE, J., not participating.