Robert A. LAMMINEN, Plaintiff,

v.

CITY OF CLOQUET, Donald Panger, Neil Nemmers, Cynthia Singpiel, Herbert Johnson, Peggy Roy, Beverly Wetzel, Jim Nelson, Cloquet Chamber of Commerce and Allen Pelvit, Defendants.

No. 5–95–294.

United States District Court, D. Minnesota.

Nov. 19, 1997.

Rebecca E. Bender, Bender & Ford, P.A., Minneapolis, MN, for Plaintiff, Robert A. Lamminen.

Pierre N. Regnier and Laurence A. Diamond, Jardine, Logan & O'Brien, P.L.L.P., St. Paul, MN, for Defendants City of Cloquet, Donald Panger, Neil Nemmers, Cynthia Singpiel, Herbert Johnson, Peggy Roy, Beverly Wetzel and Jim Nelson.

Larry C. Minton, Minton Law Office, Hibbing, MN, for Defendants Cloquet Chamber of Commerce and Allen Pelvit.

## MEMORANDUM OPINION AND ORDER

DAVIS, District Judge.

Plaintiff is a native of Cloquet, Minnesota and has lived the majority of his seventy-one years there. Since approximately 1955, Plaintiff has periodically supplied the City of Cloquet with Christmas decorations and natural garlands to decorate the city streets, businesses and homes.

In 1988, Plaintiff entered into a four year rental contract[1] with the Cloquet Area Chamber of Commerce ("Chamber") under which Plaintiff would rent to the Chamber Christmas decorations for the city streets. Plaintiff Ex. 9. The first two years under the rental contract passed with no problems. On the third year, however, the Chamber lost its funding and no longer had money to pay the lease payment for the Christmas decorations. Allen Pelvit Dep. at 24. Allen Pelvit, the Chamber's President, suggested to Plaintiff that Plaintiff arrange for pull tab organizations to pay for the Christmas decorations. *Id.*, at 25. Alternative funding was raised from area businesses, and the decorations were installed by Plaintiff. *Id.* In 1992, during what would be the fourth year of the contract by its terms, Plaintiff went ahead and put up the decorations. Pelvit states, however, that the Chamber never authorized Plaintiff to put up the decorations that year. Pelvit Dep. at 28–30. It was, and is, Pelvit's and the Chamber's position that the rental contract was null and void as the Chamber did not make the rental payment the previous year. *Id.*

Initially, the Chamber would not pay the rental fee to Plaintiff for the 1992–93 Christmas season based on its belief that there was no contract in place and that Plaintiff had installed the decorations without authorization and at his own risk. In the spring of 1993, an agreement was reached resulting in the Chamber, the City of Cloquet and the Fond du Lac Reservation each paying one third the cost of leasing the decorations for the 1992–1993 season. Plaintiff Aff. ¶ 12; Pelvit Dep. at 95. Prior to receiving the Chambers' portion of the settlement, the Chamber, the Plaintiff and his wife executed an agreement through which Plaintiff agreed to no longer "include the Chamber into their future plans; that they not discuss this situation with anyone, and that they submit our contribution to Nelson Flag & Display Service as soon as possible." Plaintiff Ex. 10; Pelvit Dep. at 88. The Chamber insisted on entering into this agreement after Plaintiff allegedly made threatening statements to the Chamber members during a heated meeting

---

**1.** Plaintiff is a sales representative for a Wisconsin company, Nelson Flag & Display Service ("Nelson Flag"), and entered into the contract on Nelson Flag's behalf.

that had been convened to resolve the dispute. Pelvit Dep. at 88.

During the summer of 1993, Plaintiff asserts that he made several inquiries of the City's Administrator, Larry Gustafson, as to whether the City was going to purchase or lease Christmas decorations for the 1993–1994 season. In response to Plaintiff's inquiries, Mr. Gustafson wrote a letter addressed to the City's mayor and to each council member, informing them of Plaintiff's interest in the City's plan with regard to Christmas decorations. Mr. Gustafson also wrote that "[d]ue to the problem encountered last year, I would like to advise [Plaintiff], in writing, as to the City's plans." Plaintiff Ex. 16. By letter dated October 7, 1993, Mr. Gustafson responded to Plaintiff's inquiries by informing him that the City had decided not to be involved in the purchase, rental, installation or removal of decorations that year. Diamond Aff., Ex. A.

In the spring of 1994, the Chamber decided to put together a task force to determine whether Christmas decorations were wanted or needed by area businesses. Pelvit Dep. at 38–39. Pelvit sent out invitations for task force meetings to businesses along Cloquet Avenue and Highway 33. *Id.*, at 39. Notice of the meetings was also given through the media and anyone could attend. *Id.* Thereafter, the task force met three times. *Id.* One City council member, Herb Johnson, attended these meetings. *Id.*, at 40. The task force ultimately determined that Christmas decorations were desired by the community. Pelvit states that prior to choosing a vendor for the Christmas decorations, he contacted a number of vendors that had sent the Chamber brochures in the past. Pelvit Dep. at 46. Pelvit took notes as to the prices quoted from various vendors. Regnier Aff., Ex. B. The task force eventually agreed that Display Sales would be the vendor for the Christmas decorations. Pelvit Dep. at 45. The task force then put together a proposal which was presented to the City's Finance Committee for the funding of the Christmas decorations. Plaintiff Ex. 12. The proposal provided that in exchange for the City funding the purchase of the decorations, the Chamber would install, remove, maintain and store the deco-

rations, and would purchase seasonal banners. *Id.* The Chamber estimated that the cost of its services with regard to the installation, removal, storage and maintenance of the decorations would be approximately $15,000. *Id.*

At the City council meeting held on August 16, 1994, Pelvit presented the Christmas decorations proposal to the Mayor and the members of the City Council. Pelvit Dep. at 184. After Pelvit's presentation, Council member James Nelson moved to appropriate $36,761 for the Christmas decorations:

> Well Mayor we discussed this, as I mentioned at our last council meeting, at Finance and I know one of the reasons we want to get this taken care of is the delivery time. We've got to get an order placed here very soon in order to have them arrive here so they can put them up by Thanksgiving. There was enough discussion about Christmas tree decorations last year, so I think the fact that they're willing to do all the putting up, taking down, storage … I think that I would move that we authorize the $36,761 to buy those Christmas tree decorations.

Council Meeting Transcript, Plaintiff's Ex. 1. The Council and Mayor unanimously approved the task force's proposal and agreed to provide the funds for the decorations. *Id.* The minutes of the August 16, 1994 meeting were prepared and approved by the Council and the Mayor at the September 6, 1994 meeting. Diamond Aff, Ex. H. The minutes for the August 16, 1994 meeting provide:

> BY COUNCILOR JAMES NELSON:
> RESOLVED: That the City of Cloquet hereby agrees to participate in the Christmas Decorations Proposal presented by the Cloquet Area Chamber of Commerce to the extent that the City will contribute up to $36,761.00 toward the purchase of said decorations.

Diamond Aff., Ex. G.

The Chamber then placed the order for decorations with Display Sales. Display Sales was directed to send the invoices directly to the City. Two such invoices were sent to the City, dated September 15, 1994 and November 11, 1994. Plaintiff Ex. 4. The invoices directed that the decorations would

be shipped to the Chamber's business address. *Id.* The City thereafter issued checks to Display Sales in October and December 1994, totaling $36,758.48. *Id.*

Plaintiff has asserted that he was never aware of the creation of the Christmas decorations task force, and was not present at the August 16, 1994 city council meeting. He states that he was in Montana, for medical testing and treatment at that time. Plaintiff Aff. ¶, 17. Upon his return from Montana, Plaintiff asserts his daughter informed him she watched the August 16, 1994 meeting on television, and that the City had approved a proposal to purchase Christmas decorations. Plaintiff Aff. ¶, 18. Thereafter, Plaintiff asserts he contacted legal counsel, who sent the City of Cloquet and its council members a letter dated December 20, 1994, informing them of Plaintiff's claim that the City should have solicited bids for the Christmas decorations. Exhibit A to Complaint. In the December 20, 1994 letter, Plaintiff did not seek injunctive or other equitable relief, only monetary relief. In fact, at no time prior to the purchase of the decorations from Display Sales did Plaintiff seek to enjoin such purchase.

It is Plaintiff's contention that the City purchased the decorations, and was thus required to utilize the competitive bidding processes provided in Minn.Stat. § 471.345. Plaintiff argues the transcript of the August 16, 1994 council meeting, together with the fact that Display Sales sent invoices directly to the City, and that the City paid such invoices, establishes that the City was the actual purchaser of the decorations.

There is no dispute that neither the City, nor the Chamber, utilized a formal bidding process for the decorations, although there is evidence that Pelvit called a number of businesses for quotes. The City asserts that it did not have to utilize bidding procedures for the Christmas decorations, because the City did not purchase the decorations on its own behalf, the Chamber did, and that the City only contributed the funds towards the Chamber's purchase of said decorations. As to the fact that the invoice was sent directly to the City, and that the City sent payment directly to Display Sales, the City asserts

that this was done to expedite the order of the decorations. Mr. Pelvit testified at his deposition, and the minutes of the August 16, 1994 meeting reflect, that time was of the essence to get the order in quickly to ensure timely delivery of the decorations by Thanksgiving. Plaintiff's Ex. 1.

More than one year after the alleged wrongful purchase of the Christmas decorations by the City, on December 14, 1995, Plaintiff filed his Complaint alleging a number of claims—failure to follow the public bidding statute, Minn.Stat. § 471.345; tortious interference with contract; conspiracy against Plaintiff, by the City, Chamber of Commerce and their respective members, to restrain trade in violation of the Sherman Act, 15 U.S.C. §§ 1 and 2; common law restraint of trade. It is Plaintiff's belief that the City and the Chamber entered into a conspiracy to deprive him of the City's decorations business because of the dispute between the Chamber and Plaintiff in 1992 over the rental contract. Plaintiff alleges that not only was he precluded from submitting a bid for the Christmas decorations as required by statute, but that Defendants also made disparaging remarks about Plaintiff regarding the contract dispute he had with the Chamber in 1992. As a result of such disparaging remarks, Plaintiff is constantly losing business. In his Complaint, Plaintiff seeks only monetary relief.

Currently before the Court are cross motions for summary judgment.

## Standard

Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Unigroup, Inc. v. O'Rourke Storage & Transfer Co.,* 980 F.2d 1217, 1219–20 (8th Cir.1992). To determine whether genuine issues of material fact exist, a court conducts a two-part inquiry. The court determines materiality from the substantive law governing the claim. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Disputes over facts that might affect the outcome of the lawsuit according to applicable

substantive law are material. *Id.* A material fact dispute is "genuine" if the evidence is sufficient to allow a reasonable jury to return a verdict for the non-moving party. *Id.* at 248–49, 106 S.Ct. at 2510–11.

### 1. Count I—Failure to Follow Requirements of Minn.Stat. § 471.345

Pursuant to Minn.Stat. § 471.345, Subd. 3, a municipality shall solicit sealed bids by public notice in accordance with the law when it enters into a contract to purchase supplies, materials, equipment or rentals, where the amount of the contract exceeds an estimated $25,000. Plaintiff alleges in Count I of his Complaint that Defendants City of Cloquet and its officials (the "City") violated Section 471.345 by not soliciting sealed bids by public notice, and that such violation has caused Plaintiff to suffer damages.

The City argues that it was not required to solicit bids for the Christmas decorations. Pursuant to Minn.Stat. § 469.191, the City argues it had the authority to appropriate up to $50,000 annually to be paid to any incorporated development society or organization of this state for promoting, advertising, improving or developing the economic and agricultural resources of the City of the Cloquet. The City argues that the decision to donate funds to the Chamber for decorations was to promote and improve the downtown area. While Plaintiff does not dispute the authority granted the City pursuant to Minn.Stat. § 469.191 to appropriate funds for certain purposes, and does not dispute that the Christmas decorations would have the effect of promoting and improving downtown Cloquet businesses during the Christmas season, Plaintiff argues the state competitive bidding statute supersedes Minn.Stat. § 469.191. In support of this argument, Plaintiff cites to § 471.345, Subd. 6 which provides:

> The purpose of this section is to establish for all municipalities, uniform dollar limitations upon contracts which shall or may be entered into on the basis of competitive bids, quotations or purchase or sale in the open market. To the extent inconsistent with this purpose, all laws governing contracts by a particular municipality or class thereof are superseded. In all other respects such laws shall continue applicable.

■ The City argues, and the Court agrees, that under the facts presented herein, § 471.345 does not supersede § 469.191 because the City, at no time, entered into a contract with Display Sales for the purchase of Christmas decorations. Pursuant to Minn. Stat. § 471.345, Subd. 2, a contract is defined as "an agreement entered into by a municipality for the ... purchase of supplies, materials, equipment ...." The City has produced evidence, which the Plaintiff has failed to refute, that the Chamber, through its president Allen Pelvit, is the entity that sought quotes from vendors, solicited Display Sales' business, and placed the order for the Christmas decorations with Display Sales. Pelvit Dep. at 161. The Defendants have also presented evidence, of which Plaintiff has failed to refute, which establishes the Chamber, not the City, would be responsible for the installation, removal, storage and upkeep of the Christmas decorations at significant cost. The decorations were in fact shipped to the Chamber's place of business and the Chamber has, in fact, installed, removed, maintained and stored the decorations since their purchase.[2]

---

2. Plaintiff asserts that three Attorney General's opinions further support his argument that Minn. Stat. § 471.345 supersedes Minn.Stat. § 469.191. *See,* Plaintiff's Ex. 21, Op.Atty Gen. 707a–15 (1977); Op.Atty.Gen. 476a–6 (1966) and Op.Atty. Gen. 130b–1 (1953). These opinions are not applicable to this case because they do not involve donations pursuant to Minn.Stat. § 469.191. Rather, two involve the acquisition of recreational facilities which are subject to different statutory provisions. Op.Atty.Gen. 707a–15; Op.Atty.Gen. 476a–6. Furthermore, these two opinions are distinguishable on their facts because they involve situations in which the facili-

ties would be owned by the municipality. The third Attorney General Opinion is also distinguishable because it involves a purchase contract entered into by a municipality. The issue addressed was whether transportation costs should be considered part of the purchase price in determining whether the competitive bidding laws are implicated. Op.Atty.Gen. 130b–1. There is no allegation in this case that the City is attempting to circumvent the bidding processes by reimbursing transportation costs. And again, the City did not enter into a purchase contract with Display Sales to purchase decorations on its own behalf.

As noted *supra*, Plaintiff points to three pieces of evidence which, he argues, proves the City purchased the Christmas decorations, and that the assertion the City donated the funds is a convenient explanation. This evidence consists of the transcript of the August 16, 1994 City Council meeting, the invoices from Displays Sales which was sent directly to the City, and the checks from the City to Display Sales totaling $36,758.48. When considering this evidence in the context of the entire record, which includes substantial evidence to which the Plaintiff has failed to refute, the Court finds that Plaintiff has failed to submit sufficient evidence which creates a genuine issue of material fact as to whether the City purchased the decorations.

■ For instance, Plaintiff would have the Court disregard the official minutes of the August 16, 1994 meeting which provide that the Council agreed to "contribute" funds for the Christmas decorations. Pursuant to state law, official council minutes are to be prepared and published within 30 days of the meeting to which the minutes relate. Minn. Stat. § 412.191, Subd. 3. The City notes that the minutes were prepared in a timely manner and reviewed and approved by the entire council at its September 6, 1994 meeting, thereby complying with the provisions of Section 412.191, Subd. 3. Diamond Aff., Ex. H. Plaintiff has not submitted convincing argument or evidence to establish the invalidity of the minutes. Contrary to Plaintiff's assertion, the two documents are not contradictory and are, in fact, consistent with the conclusion that the decorations funds were a donation or contribution from the City to the Chamber. The transcript establishes that Council member Nelson referenced the Finance Committee meetings at which the task force presented its proposal that the Chamber would be "willing to do all the putting up, taking down, storage ...". Council member Nelson also stated at the August 16, 1994 meeting that there was a time issue as to the placement of the order, to ensure timely delivery. That statement is consistent with the City's explanation as to why the invoice was sent directly to the City, and why the City paid Display Sales directly. Furthermore, Nelson's statement that the City should "buy those Christmas tree decora-

tions" is not inconsistent with the use of the word "contribute" in the minutes, for it is no secret that the City's funds covered the entire purchase price for the decorations. Plaintiff has provided no authority for the proposition that it would be legally impossible to "donate" the entire purchase price of decorations. If the intent is charitable, the amount of the donation should be irrelevant. Plaintiff argues that the City's intent was not charitable, that it acted in bad faith by not soliciting bids, because of the Plaintiff's dispute with the Chamber in 1992 with regard to the rental contract. The argument has no merit, however, as the City was not involved in the rental contract and did not have any involvement in the dispute that arose thereunder. Finally, the Court notes that the minutes were prepared and approved approximately three months before Plaintiff notified the Defendants of his claims, refuting any argument that the word "contribute" was inserted in the minutes in response to Plaintiff's claims. Accordingly, the Court will take into consideration the minutes in its determination of whether the City was required to utilize competitive bidding processes with regard to the decorations.

After carefully reviewing all of the evidence submitted by the parties, and construing those facts in a light most favorable to Plaintiff, the Court finds Plaintiff has failed to establish a genuine issue of material fact as to whether the City purchased or donated funds to the Chamber to purchase Christmas decorations pursuant to Minn.Stat. § 469.191. In fact, the Court finds sufficient unrefuted evidence has been submitted to establish the City did indeed donate the funds towards the purchase of the decorations and that the Chamber is, in fact, the owner of such decorations for all practical purposes. On this basis, dismissal of Count I is appropriate.

■ The City also asserts that even if it had been required to utilize the competitive bidding processes under Minnesota law, Count I should nonetheless be dismissed as Minnesota's competitive bidding statute specifically prohibits a court from awarding damages or attorney's fees as part of its

judgment. Minn.Stat. § 471.345, Subd. 14 provides:

> In any action brought challenging the validity of a municipal contract under this section, the court shall not award, as any part of its judgment, damages, or attorney's fees, but may award an unsuccessful bidder the costs of preparing an unsuccessful bid.

Because Plaintiff did not submit a bid in this case, the Plaintiff is totally prohibited from asserting a claim for damages under Section 471.345. The Court agrees.

The statutory language cannot be more clear, violation of the municipal contracting law does not provide for money damages. Plaintiff spends much time arguing that the case law support; his claim for relief based upon violations of bidding statutes. However, none of the cases cited by Plaintiff in support of his claim address Minnesota law. Furthermore, those cases address the issue of standing, not the right to money damages. More importantly, the cases cited by Plaintiff cannot be construed to support a claim for damages under Minn.Stat. § 471.345.

In *Metropolitan Express Services, Inc. v. City of Kansas City, Missouri*, 23 F.3d 1367 (8th Cir.1994), the Eighth Circuit held that a plaintiff has standing to challenge a municipality's bidding procedure, where such procedure prevented the plaintiff from submitting a bid. *Id.*, at 1372. In that case, however, the plaintiff was not seeking damages. Rather, the plaintiff sought to void the contract at issue. *Id.* at 1369. *See also, Unisys Corporation v. Department of Labor*, 220 Conn. 689, 600 A.2d 1019 (1991)(plaintiff seeking injunctive relief granted hearing to determine standing.); *Spiniello Construction Co. v. Town of Manchester*, 189 Conn. 539, 456 A.2d 1199 (1983)(court granted injunctive relief to plaintiff challenging the award of two public contracts).

In another case cited by Plaintiff, *Conway Corporation v. Construction Engineers, Inc.*, 300 Ark. 225, 782 S.W.2d 36 (1989) *cert. denied, Construction Engineers v. Conway Corp.*, 494 U.S. 1080, 110 S.Ct. 1809, 108 L.Ed.2d 939 (1990), the court noted in dicta

> We find the general rule to be that statutes requiring competitive bidding for government contracts are enacted for the benefit of the taxpayers rather than for the benefit of those who would sell goods and services to governmental entities. Although violation of a competitive bidding statute may create a right to an equitable remedy or mandamus, it does not give rise to a claim for damages.

*Id.*, 300 Ark. at 234, 782 S.W.2d at 41. The court went on to note that an unsuccessful bidder may bring a claim against various individuals for the tort of interference with a contract, because such claim is distinct from a claim arising under the competitive bidding statute. Because damages are not recoverable under Minn.Stat. § 471.345, the Court finds summary judgment in favor of all Defendants is appropriate as to Count I.

**2. Count II—Tortious Interference with Business**

In Count II of his Complaint, Plaintiff asserts that all Defendants tortiously interfered with Plaintiff's business by precluding him from bidding on the Christmas decorations in 1994 and by telling others in and outside of Cloquet that Plaintiff was a problem to work with.

In order for Plaintiff to recover damages for tortious interference with Plaintiff's business, Plaintiff must establish the following elements:

1. the existence of a reasonable expectation of economic advantage or benefit belonging to Plaintiff;

2. that Defendants had knowledge of that expectation of economic advantage;

3. that Defendants wrongfully and without justification interfered with Plaintiff's reasonable expectation of economic advantage or benefit;

4. that in the absence of the wrongful act of Defendants, it is reasonably probable that Plaintiff would have realized his economic advantage or benefit; and

5. that Plaintiff sustained damages as a result of this activity.

*United Wild Rice, Inc. v. Nelson*, 313 N.W.2d 628, 632–633 (Minn.1982).

■ Defendants are entitled to summary judgment as to Count II, as Plaintiff has not submitted sufficient evidence which create genuine issues of material facts as to the elements of a tortious interference claim. Plaintiff's tortious interference claim against the City, to the extent it is based on the allegation that Plaintiff was wrongfully denied the opportunity to bid on the Christmas decorations in 1994, fails as the City was not required to solicit bids. Even if the City were required to solicit bids, Plaintiff has not submitted any authority that would allow him to avoid the damages prohibition in Minn. Stat. § 471.345, Subd. 6, by asserting a tort claim against the City.

■ As noted above, the court in *Conway Corp.*, *supra*, noted in dicta, a tort claim could theoretically be brought against the individual council members. Plaintiff's claims against the individual council members and the mayor fail, however, as those individual Defendants did not wrongfully exclude Plaintiff from selling Christmas decorations to the City. Furthermore, Plaintiff has not established a genuine issue of fact as to the fourth element—that in the absence of the wrongful act of Defendants, it is reasonably probable that Plaintiff would have been selected as the vendor to provide the decorations in 1994. Plaintiff's assertion that he would have been the lowest bidder is pure speculation, for he provided absolutely no evidence to support such assertion.

■ The Court finds that Plaintiff's claims of tortious interference with Plaintiff's business against the Chamber must also be dismissed. The Chamber was under no obligation to do business with Plaintiff. As a private, non-profit organization, the Chamber is not subject to bidding requirements. Thus, the decision not to do business with Plaintiff in 1994 was not wrongful. Furthermore, Plaintiff and his wife had signed a contract with the Chamber in which Plaintiff agreed "not to include the Chamber in any of their future plans." Plaintiff Ex. 10. Accordingly, the Chamber was justified in not contacting Plaintiff with regard to the purchase of Christmas decorations in 1994. Finally, because Plaintiff has not raised a genuine issue as to whether he would have been awarded the contract had the Chamber not wrongfully excluded him, the Chamber is entitled to judgment on the tortious interference claim as it relates to the purchase of decorations from Display Sales.

■ As to Plaintiff's claims that Defendants interfered with his business in general, the Court finds dismissal is warranted as Plaintiff has completely failed to establish that any of the Defendants did any act which would establish interference with Plaintiff's business. Plaintiff first asserts that the letter from the City Administrator, Mr. Gustafson, as to the "problem encountered last year" evidences that word must have gotten out that the City considered Plaintiff a problem. The letter, however, was directed only to the Mayor and the individual council members, and Plaintiff has not provided any evidence to establish that Mr. Gustafson, or the recipients of his letter, ever disseminated its contents to outside parties.

Finally, at his deposition, Plaintiff admitted he had no evidence to support his assertions that Defendants interfered with his business. Rather, it was just his feeling that such was the case. Plaintiff Dep. at 234. It is important to note that Plaintiff testified that during the time relevant to this claim, in 1993 or 1994, he was trying to retire and was only working about 30% of what he used to work. Plaintiff Dep. at 202. Accordingly, the fact that Plaintiff wasn't getting the orders from clients that he had in the past cannot reasonably be attributed to the Defendants absent any evidence of actual interference. Defendants are entitled to summary judgment as to Count II.

### 3. Count III—Violations of the Sherman Act

■ In his Complaint, Plaintiff alleges that the City's award of the Christmas decoration contract "was an apparent 'sweetheart deal' and the result of a conspiracy between representatives of the City of Cloquet and the Chamber of Commerce (and the contract recipient) in restraint of trade and to create a monopoly." Complaint ¶ 22. Plaintiff alleges such conduct violates the Sections 1 and 2 of the Sherman Act, 15 U.S.C. § 1 and 2.

■ Section 1 of the Sherman Act provides that a contract or conspiracy in restraint of interstate commerce is illegal. To succeed on this claim, Plaintiff must show that there was an agreement between Defendants and Display Sales which was intended to harm or unreasonably restrain trade; that as a direct result Plaintiff was injured; and that the damages sustained are capable of reasonable ascertainment and are not speculative or conjectural. *Westborough Mall, Inc. v. City of Cape Girardeau*, 693 F.2d 733, 745 (8th Cir.1982) *cert. denied, Drury v. Westborough Mall, Inc.*, 461 U.S. 945, 103 S.Ct. 2122, 77 L.Ed.2d 1303 (1983). "[S]ummary judgment is only warranted when 'the evidence is so onesided as to leave no room for any reasonable difference of opinion as to how the case should be decided.'" *Id.* "The Court must be convinced that the evidence presented is insufficient to support any reasonable inference of a conspiracy." *Id.*

The Court finds that summary judgment is appropriate on this claim as well, as the Court is convinced the evidence presented is insufficient to support any reasonable inference of a conspiracy. The evidence establishes that Pelvit, on his own, sought quotes from different vendors, and ultimately recommended Display Sales as the vendor to , the task force and to the City. There is no evidence from which to infer that the City or Pelvit chose Display Sales in order to obtain financial gain, or any other ill gotten benefit. *See, Westborough Mall*, at 744 (evidence allowed for inference that the City benefitted from its zoning decisions). No such allegations have been presented by Plaintiff. Plaintiff's only asserted motive for this claim is ill-will that arose out of the rental contract dispute between the Chamber and the Plaintiff in 1992. Plaintiff has *not provided any* authority that personal animosity on the part of one who is not a competitor to the Plaintiff, can support a claim under the Sherman Act.

■ The Court also finds that summary judgment is appropriate on Plaintiff's Section 1 claim as damages are speculative. As stated *supra*, Plaintiff's claim that he would have been the chosen vendor had the City solicited bids is purely speculative.

■ Section 2 of the Sherman Act provides that "[e]very person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony." To succeed on this claim, Plaintiff must establish the existence of a conspiracy, overt acts in furtherance of the conspiracy, a substantial amount of commerce and a specific intent to monopolize. *Westborough Mall*, at 745. As noted above, Plaintiff has failed to submit evidence establishing a conspiracy. There is also no evidence of an intent to monopolize. None of the named Defendants in this case are involved in the business of selling Christmas decorations. To establish a monopoly claim under Section 2, Plaintiff would have to show a "willful acquisition or maintenance of monopoly power" which is the power to "control prices and the power to exclude competition." *Tarabishi v. McAlester Regional Hospital*, 951 F.2d 1558 (10th Cir.1991) *cert. denied*, 505 U.S. 1206, 112 S.Ct. 2996, 120 L.Ed.2d 872 (1992). There is no absolutely no evidence from which to infer any of the Defendants had the power to control the prices of Christmas decorations. Accordingly, the Section 2 claim must be dismissed.

■ Defendants also assert the Sherman Act claims must fail because Plaintiff has failed to establish the Defendant's actions affected interstate commerce. *Sun Valley Disposal Co. v. Silver State Disposal Co.*, 420 F.2d 341, 343 (9th Cir.1969). Display Sales, the chosen vendor, is located in Eden Prairie. Plaintiff contends that if he had been the vendor chosen to supply the Christmas decorations, he would have bid with projects from a company located in Indiana. The Defendants assert, and the Court agrees, that whether Plaintiff would have been the low bidder is pure speculation. Therefore, the resultant effect on interstate commerce is speculative as well and cannot support an anti-trust claim.

■ Finally, the City asserts it is entitled to summary judgment on the Sherman Act claims pursuant to the Local Government

Antitrust Act ("LGAA"), 15 U.S.C. § 36(a), which provides immunity for any person for a claim based upon any official action directed by a local government, or official or employee acting in an official capacity. Plaintiff argues the LGAA is not applicable to the City, as its council members did not act lawfully by failing to abide by Minnesota's competitive bidding processes. This Court has found, however, that the City acted lawfully when it donated funds to the Chamber pursuant to Minn.Stat. § 469.191. Accordingly, the City is entitled to summary judgment on the Sherman Act claims pursuant to the LGAA.

The City, Chamber and Allen Pelvit also argue they are entitled to summary judgment on the Sherman Act claims pursuant to the *Noerr–Pennington* doctrine. This doctrine precludes anti-trust liability as to efforts to influence public officials, so long as the public official's action is itself lawful. *Sun Valley*, 420 F.2d at 342. Because the City acted lawfully under Minn.Stat. § 469.191, all Defendants are entitled to summary judgment on the Sherman Act claims pursuant to the *Noerr–Pennington* doctrine.

### 4. Count IV—Common Law Restraint of Trade or Conspiracy

Minnesota anti-trust law is interpreted consistent with the federal court's construction of the Sherman Act. *State by Humphrey v. Road Constructors, Inc.*, 474 N.W.2d 224, 225 n. 1 (Minn.Ct.App.1991). As discussed in Section 3 above, there is no evidence which supports a reasonable inference of an unlawful conspiracy to restrain trade or to monopolize. Accordingly, Plaintiff's common law claim must fail as well.

IT IS HEREBY ORDERED that the Motions of the Defendants for summary judgment are GRANTED in their entirety. Plaintiff's Complaint is hereby DISMISSED WITH PREJUDICE.

LET JUDGMENT BE ENTERED ACCORDINGLY.